**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

REX RICHARD SAUNDERS,
                    *Plaintiff-Appellee,*

v.

BRANCH BANKING AND TRUST
COMPANY OF VIRGINIA,
                    *Defendant-Appellant,*

and

EQUIFAX INFORMATION SERVICES,
LLC; EXPERIAN INFORMATION
SOLUTIONS, INCORPORATED; TRANS
UNION LLC,
                    *Defendants.*

No. 07-1108

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Dennis W. Dohnal, Magistrate Judge.
(3:05-cv-00731)

Argued: March 20, 2008

Decided: May 14, 2008

Before MICHAEL and MOTZ, Circuit Judges, and
Irene M. KEELEY, United States District Judge for the
Northern District of West Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Michael and Judge Keeley joined.

---

**COUNSEL**

**ARGUED:** Alan Durrum Wingfield, TROUTMAN & SANDERS, L.L.P., Richmond, Virginia, for Appellant. Richard John Rubin, Santa Fe, New Mexico, for Appellee. **ON BRIEF:** Megan C. Rahman, Joshua Heslinga, TROUTMAN & SANDERS, L.L.P., Richmond, Virginia, for Appellant. Leonard A. Bennett, Newport News, Virginia, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Rex R. Saunders brought this suit, alleging that Branch Banking & Trust Company of Virginia (BB&T) violated its duties as a furnisher of information under the Fair Credit Reporting Act, 15 U.S.C.A. §§ 1681-1681x (West 1998 & Supp. 2007) (FCRA). After a full trial, the jury returned a verdict for Saunders, awarding him $1,000 in statutory damages and $80,000 in punitive damages. BB&T appeals, challenging the district court's denial of its motions for judgment as a matter of law and for remittitur. We affirm.

I.

On August 31, 2003, Saunders purchased an automobile from Richmond Mitsubishi, and the dealer assigned his loan for the car to BB&T. After experiencing mechanical trouble with the car, in late November Saunders traded it in for a new car at the dealership. The dealer paid the remaining debt on the original loan, leaving Saunders with *no* obligations under that loan.

The dealer then assigned the loan for the second car to BB&T. When Saunders did not receive a payment book for the new car in December, he telephoned BB&T, and a BB&T employee told him that he owed no money on any loan. He visited a BB&T branch and obtained a copy of his loan statement at the bank; it revealed that he owed nothing. In late January, he went to the Department of Motor Vehicles and found that his car's title showed no liens on the vehicle.

Saunders contacted BB&T several more times; each time, BB&T employees informed him that he owed no money to BB&T.

On March 8, 2004, Saunders received a letter from BB&T, informing him his payments were "seriously delinquent," his loan was in default, and BB&T had accelerated the payment schedule so that he owed a total balance of $20,441.19, including principal, interest, late fees, and "other applicable charges," all of which was to be paid in full within 10 days. Prior to the March letter, BB&T had never informed Saunders that he owed money on this loan.

After receiving BB&T's March letter, Saunders met with Thomas Holben, a BB&T lending officer, and explained that BB&T had erred in failing even to acknowledge the existence of his loan prior to March 8.[1] Saunders told Holben that he would meet his obligations under the loan, but he refused to pay any penalties or late fees since he had expressed his willingness to pay numerous times and BB&T had repeatedly erred in stating that he owed no money. Although BB&T offered to wait to assess late fees until after he had made all of the remaining payments on the loan, the bank refused to waive the late fees or penalties. Saunders responded that he was unwilling to pay down the loan if BB&T was going to charge late fees and penalties resulting from its own admitted accounting errors.

At trial, Holben conceded that BB&T did not book the second loan into its computer system until March 4, 2004, and that BB&T did not provide Saunders with an account number until March 8. Holben also admitted that BB&T learned of the loan and the failure to record the loan because Saunders "kept contacting BB&T," attempting to pay down the loan. After the loan was booked into the computer system in March, BB&T documented numerous communications from Saunders and Saunders' attorney. BB&T's records entirely accord

---

[1]Holben presented contrary testimony that BB&T did communicate with Saunders in February to arrange payment of the loan but admitted that he had no records of these communications. Obviously, the jury assessed the credibility of these two witnesses. "Through its verdict, it is evident that the jury found [Saunders] more credible, and we are in no position to take issue with that finding." *Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 280 (4th Cir. 1999).

with Saunders' testimony. The bank records reveal that Saunders sought to resolve the dispute, informed BB&T of its error in failing to communicate with him earlier, and told BB&T that he had not paid earlier because BB&T had not provided him with an account number for the loan.

On April 14, 2004, BB&T repossessed Saunders' new car and informed Saunders that he could only redeem it by paying the full amount due, including principal, interest, late fees, and a "repossession expense." Saunders tried to obtain a new loan from a credit union in order to redeem the BB&T loan and avoid further interactions with BB&T. However, BB&T had reported Saunders' loan as "in repo-[ssession] status" to the credit reporting agencies (CRAs), causing Saunders' credit score to drop from 754 to 599. Because of this substantial drop in his credit score, Saunders could not obtain a new loan from the credit union at a favorable interest rate.

Saunders contacted the CRAs (including Trans Union), lodging a dispute over the recorded information about the BB&T debt and triggering the CRAs' obligation to reinvestigate pursuant to 15 U.S.C.A. § 1681i(a). Trans Union issued an automated consumer dispute verification form to BB&T. BB&T had previously reported the repossession to Trans Union, resulting in a negative score on the loan, and in response to the dispute verification form, BB&T updated the record to reflect a "profit and loss writeof[f],"[2] resulting in the worst possible score for Saunders on the loan. The dispute verification form provided BB&T with two opportunities to indicate that Saunders had contested the legitimacy of the debt with BB&T. BB&T therefore could have indicated that it considered the debt uncollectible and also reported that Saunders had disputed the debt; if BB&T had done so, Trans Union would have reported both the debt and the dispute and would not have considered the debt in determining Saunders' total credit score. Thus, BB&T's decision to report the debt but not the dispute resulted in a much lower credit score for Saunders than a report of both the debt and the dispute.

---

[2]The terms "profit and loss writeoff" and "charge-off" describe a debt that is deemed uncollectible and written off.

Holben conceded that BB&T reported this account as a "charge-off," reflecting that Saunders had made no payments. On direct examination, Saunders' counsel asked Holben if BB&T had intended to report Saunders' loan as it had, without any indication that Saunders contested the debt. Holben responded: "With no payments made; correct." Even as the case went to trial, the record indicated that BB&T still had not changed or updated its reporting to the CRAs to reflect the ongoing dispute with Saunders about the legitimacy of the debt.

On October 24, 2005, Saunders brought this suit, alleging that BB&T violated its duties as a furnisher of information under FCRA, 15 U.S.C.A. § 1681s-2(b)(1), by failing to report the dispute. At the conclusion of the trial, the court instructed the jury on BB&T's statutory duties as a furnisher of information. The trial court also instructed the jury that it could find BB&T had violated FCRA by failing to report the ongoing dispute only if the jury concluded that BB&T's conduct excused Saunders from making his payments on the loan, *i.e.*, if the jury considered the dispute meritorious. After deliberation, the jury returned a verdict finding that BB&T had intentionally violated its duties under FCRA. The jury awarded Saunders no compensatory damages but did award the maximum possible statutory damages of $1,000 and punitive damages of $80,000.

On appeal, BB&T argues that the district court erred in denying its motion for judgment as a matter of law, because Saunders presented insufficient evidence to establish a willful violation of FCRA. BB&T also maintains that a punitive damages award of $80,000 violates the due process clause of the Constitution, and thus the district court erred in denying its motion for remittitur of the award to $4,000.

II.

BB&T initially contends that the district court should have granted its motion for judgment as a matter of law. We review *de novo* a district court's denial of a motion for judgment as a matter of law. *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001). A court may award judgment as a matter of law only if there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party. Fed. R. Civ. P. 50(a). Thus, when a jury has returned its verdict, a court may grant judgment as a matter of law only if, viewing

the evidence in a light most favorable to the non-moving party and drawing every legitimate inference in that party's favor, the court determines that the only conclusion a reasonable jury could have reached is one in favor of the moving party. *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002).

We consider first the relevant legal principles governing this FCRA claim and then the arguments offered by BB&T.

A.

"Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 127 S. Ct. 2201, 2205-06 (2007) (citing 84 Stat. 1128, 15 U.S.C. § 1681). To this end, FCRA requires CRAs to follow procedures in reporting consumer credit information that both "meet[ ] the needs of commerce" and are "fair and equitable to the consumer." 15 U.S.C.A. § 1681(b).

In addition to the duties it imposes on CRAs, FCRA also imposes duties on "furnishers of information." § 1681s-2. Under § 1681s-2(a), FCRA prohibits any person from furnishing information to a CRA that the person knows is inaccurate. Additionally, any person who "regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies" must correct and update the information provided so that it is "complete and accurate." § 1681s-2(a)(2).

At issue in this appeal are the additional duties a furnisher incurs under § 1681s-2(b) if a consumer disputes the accuracy of information that the furnisher reports. If a consumer notifies a CRA that he disputes the accuracy of an item in his file, FCRA requires the CRA to notify the furnisher of the dispute. § 1681i(a)(2). Upon receipt of this notice, a furnisher must:

> (A) conduct an investigation with respect to the disputed information;

> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency; [and]

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis . . . .

§ 1681s-2(b)(1).

Thus, FCRA requires furnishers to determine whether the information that they previously reported to a CRA is "*incomplete* or inaccurate." § 1681s-2(b)(1)(D) (emphasis added). In so mandating, Congress clearly intended furnishers to review reports not only for inaccuracies in the information reported but also for omissions that render the reported information misleading. Courts have held that a credit report is not accurate under FCRA if it provides information in such a manner as to create a materially misleading impression. *See, e.g.*, *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001); *see also Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 40-42 (D.C. Cir. 1984) (reasoning that incomplete reporting can violate FCRA when it is "misleading"); *Alexander v. Moore & Assocs., Inc.*, 553 F. Supp. 948, 952 (D. Haw. 1982).[3]

Of particular relevance here, in *Dalton* we addressed the duty of a CRA to report accurately pursuant to § 1681e. 257 F.3d at 415. We held that a report "is inaccurate" not only "when it is 'patently incorrect'" but also "when it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse[ ]' effect." *Id.* (quoting *Sepulvado v. CSC Credit Servs.*, 158 F.3d 890, 895 (5th Cir. 1998)). Thus, we held that a consumer report that contains technically

---

[3]Although the majority of cases involve the duty of a CRA to report accurately under § 1681e, BB&T concedes that the same standard of accuracy applies to a furnisher's response under § 1681s-2. Both § 1681e and § 1681s-2 serve the same purpose: ensuring accuracy in consumer credit reporting. A CRA can best fulfill its obligation to report accurately under § 1681e if it receives accurate information from a furnisher under § 1681s-2.

accurate information may be deemed "inaccurate" if the statement is presented in such a way that it creates a misleading impression. *See id.* at 415-16. The Fifth Circuit reached a similar conclusion, affirming a jury verdict finding a CRA's report inaccurate when the report described an account as "[l]itigation [p]ending," because the report omitted the fact that the consumer, as opposed to the creditor/furnisher, had brought suit. *See Pinner v. Schmidt*, 805 F.2d 1258, 1262-63 (5th Cir. 1986).

Finally, FCRA imposes civil liability on "[a]ny person" violating duties under the Act. §§ 1681n(a); 1681*o*(a). A consumer may recover compensatory damages *or* statutory damages of not more than $1,000, punitive damages, and attorneys fees from any person who "willfully fails to comply" with the requirements of the Act. § 1681n. Only compensatory damages and attorneys fees are available for negligent violations of the Act. § 1681*o*. FCRA explicitly bars private suits for violations of § 1681s-2(a), but consumers can still bring private suits for violations of § 1681s-2(b). *See* § 1681s-2(c); *see also Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431-32 (4th Cir. 2004) (affirming jury verdict in consumer suit for violation of § 1681s-2(b)).

With these principles in mind, we turn to the arguments in the case at hand.

B.

The jury found that BB&T willfully breached its obligations under § 1681s-2(b)(1) and so awarded statutory and punitive damages under § 1681n. BB&T offers three arguments as to why the district court erred in refusing to grant its motion for judgment as a matter of law. First, BB&T contends that its response to the CRAs' dispute verification form simply reflected Saunders' delinquency on his account and thus was not "incomplete or inaccurate" as a matter of law. Second, BB&T maintains that even if its response violated its duties under § 1681s-2(b)(1), Saunders failed to present sufficient evidence of intent to establish a *willful* violation. Third, BB&T insists that Saunders did not have a legitimate excuse for nonpayment after the March communications and so merited the poor credit rating he received from the CRAs. We consider each argument in turn.

1.

Despite the statutory text and precedent detailed above, BB&T contends that reporting a debt without reporting its disputed nature can *never* be deemed inaccurate as a matter of law. BB&T argues that furnishers need not report affirmative defenses raised by consumers and suggests that the consumer's filing of a dispute with the CRAs renders any reporting on the dispute by the furnisher superfluous.

According to BB&T, FCRA requires this result. BB&T relies on asserted critical differences between § 1681s-2(a) and § 1681s-2(b). The former imposes a duty on furnishers to provide accurate information, *see* § 1681s-2(a); *inter alia*, it requires furnishers to report consumer disputes, *see* § 1681s-2(a)(3). BB&T contends that the absence of a specific requirement to report consumer disputes in § 1681s-2(b) means that Congress did not intend for furnishers to report disputes to CRAs when responding to their requests for consumer dispute verification.

This argument ignores the interplay of § 1681s-2(a) and § 1681s-2(b). The first subsection, § 1681s-2(a), provides that furnishers have a general duty to provide accurate and complete information; the next subsection, § 1681s-2(b), imposes an obligation to review the previously disclosed information and report whether it was "incomplete or inaccurate" upon receipt of a notice of dispute from a CRA. The second subsection thus requires furnishers to review their prior report for accuracy and completeness; it does not set forth specific requirements as to what information must be reported, because these requirements have already been set forth in the first subsection. No court has ever suggested that a furnisher can excuse its failure to identify an inaccuracy when reporting pursuant to § 1681s-2(b) by arguing that it should have *already* reported the information accurately under § 1681s-2(a).

In addition to its misreading of § 1681s-2, BB&T also relies on a handful of district court opinions which suggest that reporting a debt without reporting a dispute to the debt is *never* inaccurate as a matter of law. *See Wadley v. Equifax Info. Servs., LLC*, 396 F. Supp. 2d 677, 679-80 (E.D. Va. 2005); *Dauster v. Household Credit Servs., Inc.*, 396 F. Supp. 2d 663, 664 (E.D. Va. 2005); *Williams v. Colonial Bank*,

826 F. Supp. 415, 417-18 (M.D. Ala. 1993); *Wright v. TRW Credit Data*, 588 F. Supp. 112, 114 (S.D. Fla. 1984). To the extent these cases depend upon such reasoning, we find that position plainly inconsistent with the statutory text and longstanding precedent discussed above, including *Dalton*. Moreover, all of these cases are distinguishable because they involved claims brought against *CRAs* under § 1681e(b) or § 1681i, while the case at hand involves a claim against a *furnisher* under § 1681s-2(b)(1). Claims brought against CRAs based on a legal dispute of an underlying debt raise concerns about "collateral attacks" because the creditor is not a party to the suit, while claims against furnishers such as BB&T do not raise this consideration because the furnisher *is* the creditor on the underlying debt.

BB&T would have us create a *per se* rule that furnishers are never obliged to report affirmative defenses or consumer disputes, regardless of how meritorious the dispute may be. Such a rule would be ill-advised. Certainly, if a consumer has a meritorious dispute — as the jury concluded Saunders did here — the consumer's failure to pay the debt does not reflect financial irresponsibility. Moreover, some courts have concluded that a disputed debt differs materially from an undisputed debt even if the consumer would not succeed at a trial of the dispute. *See, e.g.*, *Alexander*, 553 F. Supp. at 954 (arguing that consumer's dispute of default on debt, even predicated upon an invalid legal defense, is relevant if the underlying default is relevant). The *per se* rule suggested by BB&T would result in numerous reports with omissions that are "misleading in such a way and to such an extent that [they] can be expected to have an adverse effect." *Dalton*, 257 F.3d at 415 (quotations and modifications omitted).

Nor do we find persuasive BB&T's contention that a furnisher's reporting of an ongoing dispute of a debt is superfluous once a consumer has filed a dispute with any CRA. Among other things, when a furnisher reports a dispute, its report confirms that the consumer has actually contacted the furnisher and explained that the consumer believes he does not owe the debt. Moreover, Saunders presented evidence that, in the course of business, CRAs do not consider the furnisher's reporting of a dispute superfluous. For instance, when a furnisher responds to a dispute verification form and relates an ongoing dispute, Trans Union records the dispute in the credit report and

does not include the derogatory information in assessing the credit score.

In sum, given the evidence before it, the jury could reasonably conclude that BB&T's decision to report the debt without *any* mention of a dispute was "misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Id.* (quotations and modifications omitted). The district court did not err in so holding.

2.

BB&T next contends that, even if it violated its duties under § 1681s-2(b), Saunders failed to present sufficient evidence of intent to establish a *willful* violation under § 1681n. BB&T argues that, because Saunders did not provide evidence of the kind of investigation BB&T conducted in response to the dispute verification form, the jury could not conclude that BB&T violated its duties willfully. This argument has force only if Saunders presented no other evidence of intent. But, in fact, Saunders did present other evidence of intent. Specifically, Saunders presented evidence that (1) BB&T's records reflected the ongoing dispute over the debt, (2) BB&T's reports to the CRAs did not reflect that ongoing dispute, and (3) BB&T *intended* not to report that ongoing dispute. Saunders offered the *admission* of BB&T officer Holben that BB&T intended to report Saunders' loan *without mentioning* Saunders' communications or the ongoing dispute reflected throughout BB&T's records. Moreover, evidence at trial revealed that BB&T had *never* updated the report to reflect the dispute.

The district court, in accordance with our holding in *Dalton*, instructed the jury that a willful violation of FCRA occurs when "the defendant 'knowingly and intentionally committed an act in conscious disregard for the rights' of the consumer." *Dalton*, 257 F.3d at 418 (quoting *Pinner*, 805 F.2d at 1263).[4] On the basis of the evidence

---

[4]BB&T does not object to this instruction on appeal and indeed insists that this standard of willfulness is now "the law of the case." The Supreme Court has since held that willful violations of FCRA include violations committed in reckless disregard of a company's obligations under FCRA. *Safeco Ins. Co.*, 127 S. Ct. at 2208-10. Thus, the jury instructions placed an even greater burden on Saunders than current Supreme Court precedent would require.

Saunders presented, a reasonable jury could conclude that BB&T "knowingly and intentionally" chose to report the debt without reporting the ongoing dispute between Saunders and BB&T. *Id.* Again, the district court did not err in so holding.

3.

BB&T additionally contends that Saunders' dispute of the debt lacked merit, and thus BB&T had no obligation to report the dispute. Because neither party has suggested otherwise, we assume without deciding that a furnisher incurs liability under § 1681s-2(b) only if it fails to report a meritorious dispute. The trial court instructed the jury that it could only find a FCRA violation if it also concluded that BB&T's conduct excused Saunders from making his payments, and on appeal, BB&T does not identify any error of law in the jury instructions regarding excuse for failure to tender payment. Instead, BB&T argues that the facts do not support the jury's conclusion that Saunders had an excuse.

BB&T would have us rule that no reasonable jury could find that Saunders had an excuse for failing to make payments. A jury might have so concluded. But it certainly need not have done so. It is undisputed that BB&T erred in failing to book the account, erred in not providing Saunders with an account number to pay off his loan, erred in repeatedly informing Saunders that he owed nothing, and then informed Saunders that, in spite of BB&T's errors, he owed the *complete balance* on the loan. Moreover, if the jury credited Saunders' testimony, the jury could reasonably have found that BB&T, upon finally recognizing its *own* errors, insisted that Saunders make all the remaining payments on the underlying debt *and* pay all late fees and penalties. A reasonable jury could conclude that this demand excused Saunders' nonperformance.

After reviewing the record before the jury and considering BB&T's arguments, we again hold that the district court did not err in denying BB&T's motion for judgment as a matter of law.

III.

BB&T also argues that the district court erred in denying its motion for remittitur because the punitive damages award of $80,000 alleg-

edly violates the Constitution. We review a determination of the constitutionality of punitive damages *de novo*. *See Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001).

The Supreme Court has held that punitive damages can be imposed to further "legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996). Hence, "[t]he award of punitive damages in the absence of any actual damages . . . comports with the underlying deterrent purpose of the FCRA." *Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967, 972 (4th Cir. 1987). The Due Process Clause, however, "prohibits the imposition of grossly excessive or arbitrary punishments." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). The Court has "instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418. Although FCRA does place limits on civil penalties when suit is brought by the government, §§ 1681s(a)(2)(A), (c)(1)(B)(iii), Congress specifically chose not to limit punitive damages in suits brought by private parties, § 1681s-2. Thus, we agree with the Sixth Circuit's determination that the third guidepost provides "little assistance" in FCRA suits. *Bach v. First Union Nat. Bank*, 486 F.3d 150, 154 n.1 (6th Cir. 2007). We therefore here consider only the first and second guideposts.

## A.

With respect to the first guidepost, the Court has directed us to determine the degree of reprehensibility of a defendant's conduct in light of whether:

> [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and

[5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576-77).[5]

FCRA violations result in economic and emotional harm, but such violations will very infrequently cause physical harm or endanger the health and safety of others. Thus, the first and second factors will usually be absent, as they are here. Yet Congress has nonetheless authorized punitive damages in FCRA cases, so we do not believe the absence of the first or second factors weighs strongly against the punitive damages award here. *See Gore*, 517 U.S. at 583 ("[A] reviewing court . . . should 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.'" (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 301 (1989) (opinion concurring in part and dissenting in part))).

As to the fourth and fifth factors, Saunders did not establish that BB&T engaged in repeated or malicious violations of FCRA. However, evidence at trial revealed that BB&T had never updated its report to the CRAs to reflect the ongoing dispute, and the jury did find a knowing and intentional violation of FCRA. BB&T's intentional misconduct and longstanding refusal to correct its errors are more reprehensible than negligence or a mistake quickly corrected. *See, e.g.*, *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 775 (9th Cir. 2005) (reasoning that a company's failure to remedy or address the effects of a statutory violation supports punitive damages award); *Bogle v. McClure*, 332 F.3d 1347, 1361 (11th Cir. 2003) (considering

---

[5]BB&T contends that its conduct in handling the underlying debt cannot be considered in the reprehensibility analysis because only its reporting could have violated FCRA. *See State Farm*, 538 U.S. at 422 (instructing that only conduct with a "nexus to the specific harm suffered by the plaintiff" should be considered in the reprehensibility analysis). No precedent clearly addresses whether conduct regarding the underlying debt has a sufficient nexus to be appropriately considered in the reprehensibility analysis. Assuming without deciding that BB&T is correct, we strictly limit our consideration of reprehensibility to BB&T's conduct relating to the FCRA violation.

conduct more blameworthy for purposes of punitive damages analysis when it was "more than mere accident" and engaged in "intentionally").

This case clearly does involve the third factor, the "financial vulnerability" of "the target of the conduct." *State Farm*, 538 U.S. at 419. Saunders has a modest income and limited resources compared to BB&T. Furthermore, BB&T's conduct rendered Saunders significantly more financially vulnerable. The CRAs lowered Saunders' credit score substantially because of the reported debt, making it impossible for him to obtain a new loan at a favorable interest rate, but the CRAs would not have factored this debt into Saunders' credit score if BB&T had reported the dispute. Thus, BB&T's refusal to correct its error made it more difficult for Saunders to access credit and increased his financial vulnerability. *Cf. In re Russell*, 378 B.R. 735, 740-43 (Bankr. E.D.N.Y. 2007) (collecting cases involving furnishers allegedly refusing to correct reports to CRAs in order to pressure debtors into paying discharged debts, in violation of bankruptcy law).

In sum, BB&T's conduct is not extraordinarily blameworthy but is sufficiently reprehensible to justify an award of punitive damages. The third factor is certainly present, and a single factor can provide justification for a substantial award of punitive damages. *See Bach*, 486 F.3d at 154, 157 (allowing punitive damages award of $400,000 when "[t]he record established the existence of only one of the reprehensibility factors[,] . . . a vulnerable victim"). However, given the absence of the remaining factors, we review the punitive damages award amount with a particularly critical eye in considering the remaining guidepost.

B.

With respect to the second guidepost — the disparity between the actual or potential harm suffered and the punitive damages award — we recognize that although the jury awarded the maximum possible statutory damages, the $80,000 punitive damages award far exceeds the $1,000 award. BB&T argues that this 1:80 ratio is constitutionally impermissible and urges us to issue a remittitur to an award of $4,000, creating a 1:4 ratio.

Punitive damages awards that exceed a single digit ratio when compared to compensatory damages generally do present constitutional problems. The Supreme Court has long recognized that greater ratios may comport with due process, however, when reprehensible conduct results "'in only a small amount of economic damages.'" *State Farm*, 538 U.S. at 425 (quoting *Gore*, 517 U.S. at 582).

Our sister circuits agree that when a jury only awards nominal damages or a small amount of compensatory damages, a punitive damages award may exceed the normal single digit ratio because a smaller amount "would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter." *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364-65 (11th Cir. 2004) (allowing punitive damages award of $250,000 accompanying compensatory damages of $115.05); *see also Abner v. Kan. City S. R.R.*, 513 F.3d 154, 165 (5th Cir. 2008) (affirming punitive damages award of $125,000 accompanying nominal damages of $1); *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 674-78 (7th Cir. 2003) (affirming $186,000 punitive damages award accompanying compensatory damages of $5,000); *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996) (rejecting ratio analysis because "the compensatory award here was nominal, [so] *any* appreciable exemplary award would produce a ratio that would appear excessive by this measure"). Thus, we do not rely upon the challenged ratio to foreclose the punitive damages award here.

Of course, we must still determine that the punitive damages award is not constitutionally excessive. We do this by comparing the award to other cases involving similar claims, *Lee*, 101 F.3d at 812-13, and assessing whether a lesser amount would "serve as a meaningful deterrent," *Kemp*, 393 F.3d at 1365.

Examining punitive damages awards for violations of FCRA, we cannot conclude that an award of $80,000 is grossly excessive or arbitrary. *See, e.g.*, *Bach*, 486 F.3d 150 (remanding for remittitur of punitive damages award of $2,228,600 to $400,000); *Cortez v. Trans Union, LLC*, No. 05-cv-05684-JF, 2007 WL 2702945, at *2 (E.D. Pa. Sept. 13, 2007) (remanding for remittitur of punitive damages award of $750,000 to $100,000); *Boris v. Choicepoint Servs., Inc.*, 249 F. Supp. 2d 851, 863 (W.D. Ky. 2003) (denying remittitur of punitive

damages award of $250,000). Indeed, BB&T has not identified *any* recent cases, let alone any FCRA case, in which a court has, for constitutional reasons, granted remittitur of a punitive damages award that was as low as $80,000. *Cf. EEOC v. Fed. Express Corp.*, 513 F.3d 360, 378 (4th Cir. 2008) (affirming $100,000 punitive damages award accompanying compensatory damages of $8,000).

We also conclude that a smaller award would not "serve as a meaningful deterrent" to BB&T. *Kemp*, 393 F.3d at 1365. As the court noted in *Bach*, "a punitive damages award must remain of sufficient size to achieve the twin purposes of punishment and deterrence." 486 F.3d at 155 (quotations and citations omitted). This is not to say that a $400,000 punitive damages award would be appropriate in this case, as it was in *Bach*. But reducing the punitive damages award of $80,000 here would leave little deterrent or punitive effect, particularly given BB&T's net worth of $3.2 billion. *See, e.g.*, *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 462 n.28 (1993) (plurality opinion) (noting that it is "well-settled" that a defendant's "net worth" is a factor that is "typically considered in assessing punitive damages"); *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1338-39 (11th Cir. 1999) (allowing $4.35 million punitive damages award despite "100:1 ratio of the punitive to the actual damages," because compensatory damages "are quite small" and "a bigger award is needed to attract the attention of a large corporation" (quotations and alterations omitted)).

## C.

Upon consideration of the applicable guideposts, we cannot conclude that a punitive damages award of $80,000 is grossly excessive or arbitrary in this case. BB&T's conduct was sufficiently reprehensible to justify a punitive damages award, and remittitur of the current award would nullify any punitive or deterrent effect. We note that BB&T has identified no errors with the jury instructions, and the jury's decision not to award compensatory damages indicates that it was not unduly moved by sympathy or bias.

## IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.